# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHARLEAN LATRICE M.,**[1] | )    **NO. CV 19-5377-KS** |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **MEMORANDUM OPINION AND ORDER** |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| **Defendant.** | ) |
| _____ | ) |

## INTRODUCTION

Charlean Latrice M. ("Plaintiff") filed a Complaint on June 20, 2019, seeking review of the denial of her application for Disability Insurance benefits ("DI") and Supplemental Security Insurance ("SSI"). (Dkt. No. 1.) On March 9, 2020, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 12, 20-21.) On March 6, 2020, the parties filed a Joint Stipulation ("Joint Stip."). (Dkt. No. 19.) Plaintiff seeks an order reversing and remanding solely for calculation of benefits or, in the alternative, for further administrative proceedings. (Joint Stip. at 52-53.) The

---

[1]    Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

Commissioner requests that the ALJ's decision be affirmed or, in the alternative, be remanded for further proceedings. (*Id.* at 53-55.) The Court has taken the matter under submission without oral argument.

## SUMMARY OF PRIOR PROCEEDINGS

On April 7, 2015, Plaintiff, who was born on October 19, 1974, filed applications for DI and SSI.[2] (*See* Administrative Record ("AR") 75-110, 269-88.) Plaintiff alleged disability commencing July 7, 2014 due to congestive heart failure, brittle impairment, hypertensive cardiovascular disease hypertension, bipolar disorder, depression, and mitral valve prolapse. (AR 75-76, 93-94.) She previously worked as a reservation agent (DOT[3] 238.367-018). (AR 26.). After the Commissioner initially denied Plaintiff's applications and reconsideration thereof (AR 75-110, 113-48), Plaintiff requested a hearing. (AR 168-69.) Administrative Law Judge Sally Reason (the "ALJ") held a hearing on February 28, 2018. (AR 35.) Plaintiff, a vocational expert, and medical expert Ashok Khushalani, a board-certified psychiatrist, testified. (AR 37-74.). On June 8, 2018, the ALJ issued an unfavorable decision. (AR 13-28.) On April 23, 2019, the Appeals Council denied Plaintiff's request for review. (AR 1-6.)

## SUMMARY OF ADMINISTRATIVE DECISION

The ALJ found that Plaintiff met the insured status requirements through September 30, 2017. (AR 18.) She found that Plaintiff had not engaged in substantial gainful activity from the alleged July 7, 2014 onset date. (*Id.*) She determined that Plaintiff had the following severe impairments: major depressive disorder, alcohol abuse disorder, and degenerative disc disease. (*Id.*) After specifically considering listings 1.04 and 12.04, the ALJ concluded that

---

[2]     Plaintiff was 39 years old on the alleged onset date and thus met the agency's definition of a "younger person." *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).
[3]     "DOT" refers to the *Dictionary of Occupational Titles*.

Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). (AR 19.) The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform medium work with the following limitations: "she can occasionally interact with the public, and she can perform simple and detailed, but not complex, tasks." (AR 21.) The ALJ found that Plaintiff could not perform her past relevant work as a reservation agent. (AR 26.) She then determined that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant number in the national economy that Plaintiff could perform, including the jobs of laundry worker (DOT 361.684-014), scrap sorter (DOT 509.686-018), and hand packager (DOT 920.587-018). (AR 27-28.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the onset date through the date of the ALJ's decision. (AR 28.)

## STANDARD OF REVIEW

This Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (citation omitted). "Even when the evidence is susceptible to more than one rational interpretation, [the Court] must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and

the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in her decision "and may not affirm the ALJ on a ground upon which [s]he did not rely." *Orn*, 495 F.3d at 630. The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error, 'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (citations omitted).

## DISCUSSION

Plaintiff raises three issues: (1) whether the ALJ properly evaluated the opinion evidence; (2) whether the ALJ properly considered all of Plaintiff's impairments at Step Two and in the RFC assessment; and (3) whether the ALJ properly evaluated Plaintiff's subjective statements. (Joint Stip. at 2.) For the reasons discussed below, the Court concludes that the ALJ erred in her evaluation of the opinion evidence, in her Step Two analysis, and in her adverse credibility determination. As such, remand for further administrative proceedings consistent with this Memorandum Opinion and Order is warranted.

## I. The ALJ's Evaluation of Plaintiff's Treating Physicians

### A. Legal Standard

"The ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015). In

doing so, the ALJ must articulate a "substantive basis" for rejecting a medical opinion or crediting one medical opinion over another. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). An ALJ errs when she discounts an examining source's medical opinion, or a portion thereof, "while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for [her] conclusion." *Id.* at 1012-13.

The opinion of a treating source is generally entitled to greater weight than the opinion of a non-treating doctor because a treating source is "most able to provide a detailed, longitudinal picture" of a claimant's medical impairments and bring a perspective to the medical evidence that cannot be obtained from objective medical findings alone. *See Garrison*, 759 F.3d at 1012; 20 C.F.R. § 404.1527(c)(2) (governing claims filed before March 27, 2017). Likewise, the opinions of examining sources are given more weight than non-examining source opinions. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). To reject an uncontradicted opinion of a treating or examining source, the ALJ must provide "clear and convincing reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017). The ALJ need not accept a treating source's opinion if it is "brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Alternatively, "[i]f a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Trevizo*, 871 F.3d at 675. "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings." *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

//

//

//

5

## B. The Opinion Evidence

On December 29, 2016, Israel Fortuna, M.D., Plaintiff's treating psychiatrist, completed a Mental Impairment Questionnaire. (AR 1271-75.) Dr. Fortuna had seen Plaintiff once every three months since March 2015. (AR 1271.) He diagnosed Plaintiff with PTSD and unspecified mood disorder, with psychosocial factors including childhood trauma, inability to maintain long-term employment, and witnessing domestic violence. (*Id.*) Plaintiff's symptoms included depressed mood, anxiety, feelings of guilt or worthlessness, illogical thinking, obsessions or compulsions, suicidal ideation, anhedonia/pervasive loss of interest, appetite disturbances/weight change, decreased energy, and impulsive or damaging behavior. (AR 1272.) Dr. Fortuna noted that Plaintiff had frequent physical pain resulting from a severe cardiac condition that exacerbated her depressed mood. (AR 1273.) He assessed Plaintiff with no-to-mild limitation in her ability to carry out simple one-to-two step instructions, interact appropriately with the public, be aware of hazards and take appropriate precautions, set realistic goals, and independently make plans. (AR 1274.) She had moderate limitation in her ability to maintain attention and concentration for extended periods, sustain ordinary routine without supervision, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them, and respond appropriately to workplace changes. (*Id.*) And she had moderate-to-marked limitation in her ability to complete a workday without interruptions from psychological symptoms and to ask simple questions or request assistance. (*Id.*) Dr. Fortuna opined that Plaintiff was likely to be absent from work more than three times per month. (AR 1275.)

At the February 28, 2018 hearing, the ALJ heard testimony from medical expert Ashok Khushalani, M.D., a board-certified psychiatrist, who reviewed Plaintiff's medical records from February 2015 onward, except as otherwise noted in the discussion below. (AR 40-41.) Dr. Khushalani observed that in February 2015, Plaintiff was diagnosed with severe major depression recurrent and alcohol abuse disorder; in September 2015, she was diagnosed with

a mood disorder, adjustment disorder, and substance abuse; she was later reported to have alcohol abuse in partial remission and subsequently sought treatment; and in April 2017, she was reported to be mentally in good functioning. (AR 41-42.) In September 2017, Plaintiff noted that she had been doing well and it did not appear that she was in distress or had suicidal ideation. (AR 46.) Dr. Khushalani opined that Plaintiff's condition was not sufficiently severe to meet listing 12.04 because she only had minor difficulties, she has tolerated medicines well, had no major side effects or major depression, and her situation improved once she became sober. (AR 42.) He noted that Plaintiff's substance abuse may have contributed to her depression, but that Plaintiff still had depression in the absence of alcohol abuse. (*Id.*)

Dr. Khushalani opined that Plaintiff did not meet the "paragraph B" or "paragraph C" criteria of listing 12.04. (AR 43, 45.) Specifically, he stated that Plaintiff would be moderately limited in understanding, remembering, or applying information; mildly limited in interacting with others; moderately limited in concentration, persistence, and pace; and mildly limited in adapting and managing herself. (AR 43-44.) Plaintiff could perform simple and detailed, but not complex, tasks; she was not restricted in her ability to interact with coworkers and supervisors, but she should have limited contact with the public; and there was nothing in the record to suggest she could not work full-time under the opined restrictions. (AR 44-45.) Dr. Khushalani opined that "[j]ust having suicidal thoughts doesn't really amount to anything." (AR 46.) He also opined that the evidence did not support a severe impairment stemming from Plaintiff's diagnosis of PTSD related to childhood trauma. (AR 48.)

## C. The Objective Evidence of Plaintiff's Mental Impairments

In February 2015, Plaintiff was hospitalized after attempting suicide by an overdose of antihypertensive medications in the context of depression and domestic problems. (AR 396-97, 402-03.) Between March 2015 and September 2017, Plaintiff received outpatient mental health treatment. (*See* AR 615-38, 734-35, 761-66, 991-1106, 1399-1414.) During the initial

March 2015 mental health assessment, Plaintiff reported a long history of depression and anxiety due, in part, to childhood sexual abuse and assault. (AR 615-17.) She experienced thoughts of suicide, isolation, paranoia, and feeling easily threatened; anger problems, a history of violence, and homicidal ideation; and delusions, impulsivity, difficulty concentrating and focusing, frequent mood swings, difficulty sleeping, nightmares about death, and fear leaving the house. (AR 616, 621.) Due to isolation, she ignored calls from family and friends, and her mood and anger impacted her marriage. (AR 621.)

The following week, Plaintiff's had an initial medical evaluation; she was prescribed Seroquel (a mood stabilizer) and Cymbalta (an anti-depressant) for her mood instability and anxiety. (AR 637.) Plaintiff' was noted as having a "partial response" to treatment, but had "persisting symptoms of dysphoric mood, anxiety and irritability." (AR 635.) In May 2015, Plaintiff presented with a dysphoric, tearful mood and sad affect, and was referred for a crisis intervention assessment due to suicidal ideation. (AR 630.) After a crisis intervention with a social worker, Plaintiff was "in tears" and "distraught"; she again expressed suicidal thoughts, but by the end of the session, her mood became stable. (AR 628.)

In June 2015 Plaintiff reported feeling frustration, irritation, and sadness. (AR 624.) Although she reported feeling "okay" and "fine," she admitted those were "generic masking phrases." (*Id.*) During a July 2015 appointment, Plaintiff was "tearful" and exhibited "objective signs of depression" with poor eye contact, slow speech, depressed mood, sad affect, poverty of thoughts, and auditory hallucinations. (AR 734.) Plaintiff's medication dosages were increased. (*Id.*) In August 2015, Plaintiff reported having side effects, but was unsure whether they were due to her psychiatric or cardiac medications. (AR 766.) Plaintiff's mental status examinations showed symptoms associated with her condition similar to those she previously exhibited, and her medications were again increased to address persisting symptoms. (*Id.*) In September and December 2015, Plaintiff's mental status examination findings remained unchanged and her medications were continued. (AR 761, 764.)

In January 2016, Plaintiff was hospitalized for three days after complaining of depression and anxiety, and attempting suicide while intoxicated. (AR 905-10.) She was thereafter diagnosed with bipolar disorder with psychotic features and her medications were switched to Paxil (anti-depressant) and Latuda (anti-psychotic). (AR 1004.) In February 2016, Plaintiff reported that while the Latuda worked, the Paxil did not. (AR 1002.) In April 2016, Plaintiff reported that her depression and anxiety persisted and she asked to switch back to Seroquel; however, her doctor noted that Seroquel was not indicated due to Plaintiff's "severe cardiac condition." (AR 1000.) In May 2016, Plaintiff again reported depression and psychosis, stating she was hearing more voices; her Latuda was increased. (AR 998.) In August 2016, Plaintiff exhibited a slightly anxious mood and stated her medications were "partially effective in maintaining stability," but she had persisting symptoms of "irritability and bouts of anxiety [and] insomnia." (AR 996.) Her anti-psychotic medication was increased and Vistaril, an antihistamine used to treat anxiety, was added to her regimen. (*Id.*)

In February 2017, Plaintiff reported that she was not doing well because she had discontinued Latuda due to lack of insurance, and did not believe her Cymbalta was working. (AR 991.) She reported mood swings, hallucinations while driving, and an episode where she tried to stab her husband. (*Id.*) On examination, she exhibited poor eye contact, slow speech, depressed mood, sad affect, poverty of thoughts, and auditory hallucinations. (*Id.*) Plaintiff was prescribed Abilify (anti-psychotic). (AR 992.) In April 2017, Plaintiff stated she was "doing fair but her mood is still not that good." (AR 1399.) On mental status examination, she smelled of smoke and alcohol, had slurred speech, an "okay" mood, her affect was slightly odd and tearful, she was mildly disorganized and had some circumstantial thoughts, fair judgment, and fair to poor insight. (AR 1399-1400.) Her Abilify dosage was increased. (AR 1400.) In June 2017, Plaintiff's mental status examination was unchanged. (AR 1403-04.) In July 2017, Plaintiff stated she had decreased her drinking and noticed that things were making her more overwhelmed and that she felt more paranoid. (AR 1407.) Plaintiff's mental status examination remained unchanged in July 2017. (AR 1408.) In September 2017, Plaintiff

9

stated that she was having suicidal thoughts, but admitted that she had no intention on acting on such thoughts.  (AR 1410.)

**D. The ALJ's Decision**

The ALJ gave substantial weight to the opinion of Dr. Khushalani, noting that while he was not Plaintiff's treating or examining physician, he was board-certified in psychiatrist and had practiced for many years, providing him with "knowledge, training, and a perspective not shared by the other physicians of record and which could reasonably be expected to give him greater insight into the limitations imposed by [Plaintiff's] impairments." (AR 24.)  The ALJ also found that as an expert witness, Dr. Khushalani had knowledge of the Social Security disability program and had access to Plaintiff's records when he offered his opinion.  (*Id.*)

The ALJ gave partial weight to the opinion of Dr. Fortuna.  (*Id.*)  She noted that although Dr. Fortuna determined that Plaintiff had moderate to marked limitations in her ability to complete a workday without interruptions from psychological symptoms or to ask simple questions and request assistance, his opinion suggested that Plaintiff had generally mild or otherwise unknown to him limitations.  (*Id.*)  Additionally, the ALJ found that the more marked limitations opined by Dr. Fortuna were not entirely supported by the objective medical evidence because, though the record revealed ongoing symptoms of depression and anxiety with associated functional limitations, Plaintiff also "reported long periods of symptom stability, and she exhibited good symptom improvement with sobriety and treatment compliance." (AR 24-25.)

**E. Analysis**

Plaintiff contends that the ALJ erred in adopting the opinion of Dr. Khushalani, a non-examining medical expert, in favor of the opinion of Dr. Fortuna, Plaintiff's treating

psychiatrist. (Joint Stip. at 9-14.) Plaintiff alleges a myriad of errors committed by the ALJ. First, Dr. Khushalani's opinion was not supported by independent clinical findings because he only reviewed and merely disagreed with Dr. Fortuna's opinion. (*Id.* at 9-10.) Second, the ALJ erred in crediting Dr. Khushalani's opinion because of his purported expertise and insight into Plaintiff's condition. (*Id.* at 10.) Third, Plaintiff's isolated instances of symptom improvement are not a proper basis for discounting Dr. Fortuna's opinion, especially where Plaintiff's improvement did not last long enough for her to return to substantial gainful activity. (*Id.* at 10-12.) Fourth, despite acknowledging evidence of Plaintiff's "ongoing" mental health issues, the ALJ failed to explain how any evidence contradicted Dr. Fortuna's opinion. (*Id.* at 12-13.) Fifth, the ALJ actually rejected all of Dr. Fortuna's opined limitations without explanation, despite giving his opinion partial weight. (*Id.* at 13-14.) Finally, the ALJ erred by not performing the proper regulatory analysis in considering the weight to give to Dr. Fortuna's opinion. (*Id.* at 14.)

The Court turns first to the ALJ's evaluation of Dr. Khushalani's opinion and concludes that the ALJ erred in her evaluation of that opinion. "The opinions of non-treating or non-examining physicians may . . . serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). As such, an ALJ generally does not err in giving great weight to a non-examining physician when the physician's opinion is consistent with the record. *See Mitchell v. Colvin*, 642 F. App'x 731, 732 (9th Cir. 2016). Plaintiff argues that Dr. Khushalani reviewed only, and merely disagreed with, Dr. Fortuna's opinion. (Joint Stip. at 9-10.) Plaintiff is incorrect. Dr. Khushalani reviewed all of Plaintiff's psychiatric treatment records, in addition to the majority of the rest of the medical record.[4] (AR 22, 40-48.) This included Dr. Fortuna's opinion, as well as all of Plaintiff's records from the date she was first admitted

---

[4] The only evidence Dr. Khushalani did not review were 134 pages of progress notes from AV Cardiology Associates between September 2016 and January 2018, and from Dr. John Fisher of AV Meridien Medical Group. (*See* AR 1700-1834.)

to the hospital in February 2015 through the date of the hearing (except as noted in footnote 4). (*See* AR 385-1699.). Thus, contrary to Plaintiff's contention otherwise, Dr. Khushalani did more than simply review and disagree with Dr. Fortuna's opinion.

However, the ALJ erred in relying on Dr. Khushalani's opinion because his characterizations of the record on which he apparently relied are inconsistent with the evidence actually contained therein. *See Thomas*, 278 F.3d at 957. For example, Dr. Khushalani stated that in April and September 2017, Plaintiff reported that she was mentally in good functioning, and she did not appear to be in significant distress or have suicidal ideation. (AR 41-42, 46.) But five months earlier, in April 2017, Plaintiff stated that she was "doing fair but her mood is still not that good," a mental status examination revealed symptoms associated with substance use and mental health impairment, and her dosage of anti-psychotic medication was increased. (AR 1399-1400.) And in September 2017, Plaintiff stated that she had thoughts of suicide, even though she admitted that she did not intend to act on such thoughts. (AR 1410.) Dr. Khushalani also stated that Plaintiff had good tolerance for her medications with only "minor difficulties" (AR 42), but the record reveals several instances of Plaintiff's medication not adequately treating her symptoms, requiring doctors to increase her dosages or change her medication regimen (*see, e.g.*, AR 635 (March 2015 note of partial response to treatment with persistent symptoms), 734 (July 2014 medication dosage increase), 996 (August 2016 anti-psychotic medication dosage increase and anti-anxiety medication added to regimen), 1000 (April 2016 Plaintiff complaint that medication not working), 1004 (January 2016 medication switch due to suicide attempt)). Given the frequency of Plaintiff's need to adjust her treatment based on failed attempts to adequately treat her symptoms, the difficulties she experienced hardly seem minor. Finally, Dr. Khushalani's statement that "[j]ust having suicidal thoughts doesn't really amount to anything," troubles the Court, especially when Plaintiff actually attempted suicide on two occasions, resulting in hospitalization. (AR 46, 396-97, 402-03, 905-10.) Due to these multiple and significant inconsistencies, the Court finds that Dr. Khushalani's opinion does not constitute substantial evidence to support the ALJ's decision.

The reasons the ALJ gave in support of the weight given to Dr. Khushalani's opinion are also problematic. The ALJ credited his opinion because of his medical expertise and knowledge of social security rules and regulations. (AR 24.) Plaintiff does not challenge Dr. Khushalani's expertise, and his proficiency and experience in his field is readily apparent to the Court. (AR 1696-98 (Dr. Khushalani's resume).) The ALJ did not err *per se* by crediting Dr. Khushalani's opinion because he is a board-certified in psychiatrist with years of expertise unsurpassed by Plaintiff's treating physicians, giving him unique insights into Plaintiff's condition; and because he had knowledge of social security regulations. *Cf. Wimberly v. Astrue*, Case No. CV 07-1952-JC, 2008 WL 4381617, at *5 (C.D. Cal. Sept. 25, 2008) ("When the ALJ considers the findings of a state agency medical consultant, the ALJ evaluates the findings using factors such as . . . expertise in social security rules[.]"); *see also Massimo v. Comm'r of Soc. Sec.*, 2019 WL 3892325, at *6 (E.D. Cal. Aug. 19, 2019) ("The state agency consultants are experts in their respective fields and are familiar with Social Security rules and regulations governing disability."); *Gardner v. Astrue*, Case No. CV 11-9616-JEM, 2012 WL 4052047, at *3 (C.D. Cal. Sept. 14, 2012) (affirming ALJ statement that it is not necessary that medical expert be a board-certified specialist in every impairment area to render of a complete assessment based appropriately on the evidence in the record).

However, a doctor's expertise and familiarity with the Agency rules and regulations alone cannot anchor the ALJ's evaluation of the opinion evidence. If that were the case, ALJs would credit the opinions of state agency consultants in every instance, regardless of those consultants' evaluations of the other relevant factors in a case. Accordingly, where the expert "provided opinions consistent with the record," the ALJ does not err where she "properly use[s] the entire record to evaluate Plaintiff's mental [RFC]," and "d[oes] not 'cherry pick' the record, nor make an 'independent finding' of Plaintiff's mental illness." *Massimo*, 2019 WL 3892325, at *6. Here, as discussed above, Dr. Khushalani's opinion is not consistent with the record, rather, he mischaracterized aspects of the record and offered his opinion based, at least in part, on those mischaracterizations. Therefore, no matter how knowledgeable Dr.

Khushalani is in his field or in Agency rules, that knowledge alone is not sufficient to affirm the ALJ's evaluation of his opinion. Absent additional, legitimate bases for crediting Dr. Khushalani's opinion, the ALJ's evaluation of that opinion is not legally supported.

Turning to the ALJ's evaluation of Dr. Fortuna's opinion, it appears that the ALJ partially credited the treating psychiatrist's opinion because the record showed that Plaintiff had "ongoing symptoms of depression and anxiety, accompanied by poor concentration, some memory deficits, and difficulty interacting with others." (AR 24.) But the ALJ erred in discounting Dr. Fortuna's opinion on the basis of Plaintiff's brief periods of symptom stability and improvement with sobriety and treatment compliance. Instances of partial or temporary improvement do not constitute substantial evidence to contradict a treating physician's opinion. *See Ghanim v. Colvin*, 763 F.3d 1154, 1161-62 (9th Cir. 2014); *see also Garrison*, 759 F.3d at 1017 ("Cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."); *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."). "Reports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms." *Garrison*, 759 F.3d at 1017. Here, the ALJ failed to address Plaintiff's periods of symptom improvement in the context of her condition as a whole. Notably, often when Plaintiff reported feeling "fine" or "okay," she also acknowledged that those phrases were "generic masking phrases" (AR 624), and Plaintiff's doctors contemporaneously reported that Plaintiff's symptoms persisted and, as a result, her doctors intensified treatment (*see, e.g.*, AR 628-30 (Plaintiff's partial response to treatment, but simultaneous crisis intervention interview due to suicidal ideation), 635 (partial response to treatment, but persisting symptoms of dysphoric mood, anxiety, and irritability, requiring

medication increase)).  Additionally, assuming Plaintiff's condition did, in fact, improve, her brief periods of improvement did not last—within months of her condition noted as being stable, her medications were increased (AR 766) and she attempted suicide (AR 905-08).

The ALJ also determined that Dr. Fortuna's opinion was entitled only to partial weight because some of his opined limitations were not supported by the objective medical evidence. (AR 24.)  But the ALJ did not identify or explain what evidence contradicted Dr. Fortuna's opined limitations.  Therefore, this reason the ALJ gave for rejecting Dr. Fortuna's opinion is conclusory and must be rejected.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

Accordingly, the ALJ erred in her evaluation of the opinion evidence in this case and because the Court concludes the errors related to the assessment of Plaintiff's psychiatric history is not harmless, remand for proper reconsideration of the opinion evidence is warranted.

## II.    The ALJ's Step Two Analysis

Plaintiff contends that the ALJ erred by finding that Plaintiff's cardiac impairment was non-severe; in evaluating the severity of the limitations stemming from Plaintiff's alleged spinal impairment; and by failing to mention Plaintiff's knee, shoulder, hip, or head pain. (Joint Stip. at 33-37.)

### A. Legal Standard

At step two of the sequential analysis, the ALJ must determine whether the claimant has a medically determinable impairment, or combination of impairments, that is "severe."  The Commissioner defines a severe impairment as "[a]n impairment or combination of impairments . . . [that] significantly limit[s] your physical or mental ability to do basic work

15

activities," including, *inter alia*: "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." 20 C.F.R. §§ 404.1522, 416.922. "An impairment or combination of impairments may be found not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citations and internal quotation marks omitted). If "an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." *Id.* at 687 (citation and internal quotation marks omitted). "Step two, then, is a *de minimis* screening device [used] to dispose of groundless claims, and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when [her] conclusion is clearly established by medical evidence." *Id.* (emphasis added) (citations and internal quotation marks omitted).

An ALJ must consider all of the limitations imposed by a claimant's limitations, even those that are not severe. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). "Even though a non-severe 'impairment standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim.'" *Id.* (quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (1996)).

## B. Evidence of Plaintiff's Alleged Physical Impairments

Between January 2015 and February 2016, Plaintiff was treated by Anil Kumar, M.D., a cardiologist, complaining consistently of symptoms of dyspnea with activity, chest pain, fatigue, shortness of breath with exertion, palpitations with physical activity, chest heaviness when lying supine, and mild swelling of the lower extremities. (AR 385-94, 452-57, 639-49,

959-72.)  On examination, Dr. Kumar observed a midsystolic murmur, trace edema, and, on several occasions, elevated blood pressure.  (AR 386, 392, 453, 640, 644, 647, 963, 967.)  Dr. Kumar ordered objective studies, which produced findings, as follows.

A January 2015 echocardiogram found mild to moderate mitral regurgitation, moderate concentric left ventricular hypertrophy, mild tricuspid regurgitation, and moderate pulmonary hypertension; otherwise, the findings were unremarkable.  (AR 387.)  March 2015 myocardial perfusion imaging showed mostly normal findings, with no fixed or reversible defects, blood pressure within normal range, and no wall motion abnormalities; however, it showed a mildly enlarged left ventricle, mild global left ventricular dysfunction, and an ejection fraction ("EF") of 49 percent.[5]  (AR 456.)  An October 2015 echocardiogram found normal left ventricular size, mild global left ventricular dysfunction with an EF of 45 percent, severe concentric left ventricular hypertrophy, thickened mitral leaflets, moderate-to-severe mitral regurgitation, normal right heart chambers and tricuspid valve, and moderate tricuspid regurgitation.  (AR 971-72.)

Dr. Kumar diagnosed Plaintiff with hypertension and moderate mitral regurgitation. (AR 388, 454, 641, 960.)  Plaintiff's hypertension was difficult to control, despite compliance with medications, and Dr. Kumar made several attempts to adjust Plaintiff's medication regimen, but her blood pressure continued to fluctuate between normal and elevated levels. (AR 385, 388, 390, 393, 452, 454, 639, 641, 645, 648, 960, 962, 964.)  As a result of the October 2015 echocardiogram, Dr. Kumar observed that the worsening EF seemed to be from uncontrolled hypertension.  (AR 969.)  He also recommended a nephrology consultation for additional input on how to manage the hypertension (*id.*), but the record does not contain evidence that Plaintiff consulted a nephrologist.

---

[5]     The EF is a measure of how well the heart pumps blood.  An EF of 41% to 49% is considered "borderline" and may not always indicate heart failure, but may indicate damage to the heart.  *See Ejection Fraction Heart Failure Measurement*, AMERICAN HEART ASSOCIATION (last reviewed May 31, 2017), https://www.heart.org/en/health-topics/heart-failure/diagnosing-heart-failure/ejection-fraction-heart-failure-measurement.

Between September 2016 and January 2018, Plaintiff presented to cardiologist Moneer Eddin, M.D. with symptoms of chest discomfort, dizziness, shortness of breath, inability to walk short distances without becoming short of breath, and leg swelling. (AR 1700-58.) Dr. Eddin diagnosed Plaintiff with congestive heart failure with diastolic dysfunction, mitral regurgitation, diabetes, uncontrolled hypertension, and chronic obstructive pulmonary disease. (AR 1704, 1709, 1714, 1719, 1736, 1741, 1747-48.) Generally, though, his notes revealed that Plaintiff had "no real symptoms of shortness of breath," and he did not recommend mitral valve surgery "given her lack of symptoms." (*See generally id.*) Moreover, Plaintiff reported that the medication Dr. Eddin prescribed, including Furosemide, decreased her swelling, and improved her blood pressure and symptoms of fatigue and shortness of breath. (AR 1715.) Between May 2015 and June 2017, Plaintiff also presented to the emergency room at Antelope Valley Hospital on ten occasions, complaining of cardiac symptoms, including chest pain, dizziness, shortness of breath, and elevated blood pressure. (AR 534-37, 771-72, 786, 788-90, 798, 811-13, 826, 829-31, 1040, 1043-45, 1118, 1130-32, 1514-18.)

As to Plaintiff's spinal condition, the record shows that between July 2016 and August 2017, Plaintiff sought treatment from George Perdikis, M.D., a pain medicine specialist. (AR 1148-55, 1291-1364.) Although it is difficult to decipher some of Dr. Perdikis's notes due to illegible handwriting, the Court can discern many of his notations. Specifically, Dr. Perdikis consistently noted that Plaintiff suffered from low back, knee, shoulder, and hip pain, as well as muscle spasms and migraines; she took a variety of opioid and non-opioid medications to manage her pain; and physical examinations revealed that her range of motion was limited due to pain. (AR 1148, 1150, 1154-55, 1291, 1294, 1296, 1298, 1301, 1306, 1309, 1311, 1313, 1322, 1327-28, 1331, 1333, 1335, 1338, 1343, 1346, 1348, 1350, 1359, 1364.) Dr. Perdikis consistently scheduled follow-up appointments with Plaintiff and continued her course of treatment. (*See generally id.*) His notes do not indicate that Plaintiff required more extensive treatment for her pain.

//

Additionally, objective findings included in Dr. Perdikis's notes include March and August 2017 x-rays on both knees, which showed unremarkable results (AR 1304-05, 1341-42); a July 2016 lumbar spine MRI, which showed minimal facet arthropathy at L4-L5 and L5-S1, but otherwise unremarkable findings with no significant degenerative disc disease, disc herniation, or other abnormalities (AR 1318, 1355); a July 2016 cervical spine MRI, which showed moderate to moderate-to-severe degenerative disc disease at C5-C6, C4-C5, and C6-C7 with broad 2 to 3 millimeter protrusions and disc osteophytes with mild to moderate central canal narrowing and mild foraminal narrowing (AR 1320-21, 1357-58); and a November 2016 thoracic spine MRI, which showed minimal degenerative disc disease at T10-11, but otherwise unremarkable findings (AR 1325-26, 1362-63).

### C. The ALJ's Decision

At step two, the ALJ found that the Plaintiff had the following medically determinable impairments that significantly limited her ability to perform basic work activities: major depressive disorder, alcohol abuse disorder, and degenerative disc disease. (AR 18.) The ALJ then found that the record contained evidence of the following additional impairments: hypertension, diabetes, and carpal tunnel syndrome. (AR 19.) But she found those impairments non-severe because "they d[id] not cause a significant limitation of physical or mental ability to do basic work activities." (*Id.*) Specifically, the ALJ found that these impairments either improved within one year or were mild in nature such that they did not affect Plaintiff's ability to work. (*Id.*) She noted, as an example, that Plaintiff's cardiac testing showed that her hypertension did not impact her cardiac function; there was no indication that Plaintiff had functional limitations due to her diabetes (even though Plaintiff alleged that she received in-home health service to obtain injections); and there were no electromyography or nerve conduction studies in the record to support Plaintiff's allegation of carpal tunnel syndrome. (*Id.*) The ALJ's decision did not include a discussion of any alleged knee, shoulder, or hip pain; or headaches.

During her RFC discussion in the decision, the ALJ briefly discussed evidence of Plaintiff's back impairments—stating that a cervical spine MRI showed moderate to severe degenerative joint disease, with disc protrusion and mild central canal narrowing; a lumbar spine MRI showed some minimal facet arthropathy with no significant disc disease, herniation or canal narrowing; and a thoracic spine MRI showed that Plaintiff had some minimal degenerative disc disease at T10-11, but no evidence of central canal or neural foraminal narrowing, or any significant annular bulge or disc herniation. (AR 24.) The ALJ observed that Plaintiff sought treatment from Dr. George Perdikis for her back pain, but his notes were mostly handwritten, largely illegible, and contained few objective findings useful in assessing Plaintiff's functional limitations. (*Id.*) The ultimate RFC did not contain limitations associated with Plaintiff's degenerative disc disease or spinal impairment. (AR 21.)

### D. Discussion

Plaintiff first contends that the ALJ erred by finding that Plaintiff's cardiac impairment was non-severe. (Joint Stip. at 33-36.) She argues she had chronic and serious cardiac symptoms that were difficult to control, the ALJ's decision ignored that evidence, and this error was not harmless because the ALJ failed include in the RFC analysis any discussion of Plaintiff's non-severe impairments. (*Id.* at 33-35, 41-42.) Plaintiff further argues that the ALJ erred by failing to permit Plaintiff to offer a theory of disability that accounted for her cardiac impairments and, if the ALJ required clarification of the impact of Plaintiff's cardiac condition, she should be required to further developed the record to that effect. (*Id.* at 35-36.) Next, Plaintiff argues that the ALJ erred in evaluating her limitations stemming from spinal impairments because the ALJ relied solely on MRI reports, discredited a doctor's notes as illegible and containing few useful objective findings, but did not seek additional evidence that would assist her determination of the impact of Plaintiff's spinal impairments. (*Id.* at 36-37.) Finally, Plaintiff asserts that the ALJ failed to mention Plaintiff's knee, shoulder, hip, or head pain and failed to discuss how those symptoms impacted the RFC analysis. (*Id.* at 37.)

As an initial matter, Plaintiff's characterization of these issues as step two issues arguably is incorrect. Because Plaintiff prevailed at step two (but with fewer impairments than she had alleged), her claim of prejudicial error from the ALJ's step two analysis is meritless. *See Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (holding that because step two was decided in claimant's favor, he was not prejudiced); *see also Loader v. Berryhill*, 722 F. App'x 653, 654-55 (9th Cir 2018) (where the claimant prevailed at step two, and his case proceeded to the remaining steps on the basis of "other" severe impairments, "it made no difference for the ALJ's ensuing analysis whether his medically determinable depression was previously considered 'severe'"). Instead, the question is whether the ALJ's ensuing analysis properly accounted for the limitations caused by her medically determinable physical impairments, as reflected in the opinions of Drs. Kumar, Eddin, and Perdikis. *See Loader*, 722 F. App'x at 655 (finding that, where claimant prevailed beyond step two, the issue was whether the limitations from her condition were properly considered, even though it was categorized as non-severe) (citing 20 C.F.R. § 1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe[.]'")).

Turning first to Plaintiff's arguments concerning her alleged cardiac impairment, the ALJ may have properly determined that Plaintiff's cardiac impairment was non-severe at step two. But she erred by failing to discuss Plaintiff's cardiac condition or the significant record evidence of that condition at subsequent stages of the sequential analysis. Plaintiff presented medical evidence showing consistent treatment for cardiac conditions for a period exceeding one year. (AR 385-94, 452-57, 639-49, 959-72, 1700-58.) During his examinations, Dr. Kumar observed a midsystolic murmur, trace edema, and hypertension. (AR 386, 392, 453, 640, 644, 647, 963, 967.) Objective studies confirmed that Plaintiff had arguably more than slight abnormalities in her cardiac function. (AR 387 (echocardiogram showing mild to moderate or moderate abnormalities in some areas), 456 (myocardial perfusion imaging showing mildly enlarged ventricle, mild global left ventricular dysfunction, and EF in

borderline range), 971-72 (echocardiogram showing some moderate and moderate-to-severe abnormalities with worsening EF).) Additionally, while he did not recommend that Plaintiff have surgery, Dr. Eddin diagnosed Plaintiff with congestive heart failure with, *inter alia*, mitral regurgitation and uncontrolled hypertension. (AR 1704, 1709, 1714, 1719, 1736, 1741, 1747-48.) The ALJ did not discuss any of this evidence in her RFC analysis and the ultimate RFC determination contained no implicit suggestion that Plaintiff's cardiac impairment was considered. The undisputed evidence of Plaintiff's cardiac condition does not obviously suggest that that condition had no impact on her functional ability; thus, the ALJ should, at the very least, have explained how the record evidence supported her conclusion that Plaintiff's cardiac impairment did not impact her ability to do work activity.

Turning to Plaintiff's alleged spinal impairment, the ALJ found that Plaintiff suffered from a severe impairment in the form of degenerative disc disease. (AR 18.) In her RFC discussion, the ALJ *did* discuss evidence of Plaintiff's spinal impairment. (AR 24.) However, the ALJ erred because she constructed an RFC without any legitimate consideration of the impact of Plaintiff's severe spinal impairment on her functional limitations. *Cf. Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (rejecting Plaintiff's argument that the ALJ failed to account for her severe condition in the final construction of the RFC because the ALJ's RFC did account for that condition). In her discussion, the ALJ summarized the results of the objective studies performed on Plaintiff's cervical, lumbar, and thoracic spine. (AR 24.) This evidence showed that Plaintiff had at least some moderate-to-severe abnormalities in areas of her spine (AR 1320-21, 1357-58 (cervical spine MRI); *see also* AR 24 (ALJ discussion of cervical spine MRI)). *Cf. Burch*, 400 F.3d at 681 (rejecting plaintiff's allegation of severe back pain because "the MRIs and x-rays showed only mild degenerative disc disease"). Therefore, the Court strains to understand how the ALJ's decision to simply summarize that evidence without analyzing its impact on Plaintiff's RFC is without legal error. Conceivably, the ALJ's decision may suggest that she did not believe Plaintiff's spinal impairment had any impact on Plaintiff's functional ability. But that hypothetical

22

conclusion is not supported by substantial record evidence when the objective evidence cited by the ALJ of Plaintiff's spinal condition showed evidence of a severe impairment. The ALJ's failure to reconcile that objective evidence with an RFC that did not apparently account for any of that evidence is legal error. The error is not harmless because a proper consideration of Plaintiff's spinal impairment could have a material impact on the RFC determination.

The only other evidence related to Plaintiff's back impairment was Dr. Perdikis's treatment notes, which the ALJ rejected as illegible. (*See* AR 24.) The Court takes issue with the ALJ's decision to discount that evidence as wholly illegible because an independent examination of those records reveals many legible probative notes. (*See* AR 1148-55, 1291-1364.) But even assuming Dr. Perdikis's notes were entirely illegible, where a "physician's documentation is illegible and, therefore, inadequate to allow for proper evaluation of medical evidence, the ambiguity triggers the ALJ's duty to develop the record." *Garcia v. Colvin*, Case No. CV 14-2528-GW (KS), 2015 WL 7573653, at *8 (C.D. Cal. Nov. 25, 2015) (citing *Burch*, 400 F.3d at 679; *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (holding that the ALJ "has an independent duty to fully and fairly develop the record and to assure that the claimant's interested are considered")). Accordingly, because the ALJ failed to reconcile the evidence of Plaintiff's spinal impairment with an RFC that did not account for any limitations posed by that impairment, and because she failed to further develop the record to adduce adequate evidence on which she could make a determination as to the limitations imposed by the spinal impairment, the ALJ committed reversible error.

The Commissioner argues that any alleged error made by the ALJ in her decision as to Dr. Perdikis's notes would be harmless because contemporaneous reports from Dr. Eddin showed that Plaintiff's gait and strength were normal. (Joint Stip. at 40-41.) The Court disagrees. Primarily, Dr. Eddin is a cardiologist, whose notes about Plaintiff's back condition are hardly determinative of the severity of Plaintiff's spinal condition. Additionally, contrary to the Commissioner's contention, the objective evidence of Plaintiff's back condition, as

discussed above, showed that Plaintiff arguably suffered from at least some moderate-to-severe symptoms. Therefore, clearer notes from Dr. Perdikis may be consequential to the ultimate determination of the limitations imposed by Plaintiff's back impairment. *See Garcia*, 2015 WL 7573653, at *8 (citing *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 19 (1st Cir. 1996) (holding that "unreadable entries may have some import" and "it is the duty of the ALJ, on remand, to make some effort to decipher them")).

Finally, Plaintiff argues that the ALJ erred by not mentioning Plaintiff's knee, shoulder, or hip pain, or headaches. (Joint Stip. at 37.). "[I]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, at *5; *see Carmickle*, 533 F.3d at 1164. Plaintiff's subjective symptoms must be considered at step two. 20 C.F.R. § 404.1529; *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996); *Lamell v. Colvin*, 2014 WL 282414, at *1-*4 (N.D. Cal. Jan. 24, 2014). Plaintiff's allegations of knee, shoulder, and hip pain, as well as migraines were consistently noted throughout Dr. Perdikis's notes, which the ALJ disregarded as illegible. (*See, e.g.*, AR 1148, 1150, 1154, 1291, 1294, 1296, 1298, 1301.) Even if the ALJ believed that these symptoms did not contribute to the ultimate functional analysis, she still had a duty to *discuss* the extent of those impairments and their impact on Plaintiff's function ability. *See Carmickle*, 533 F.3d at 1164; SSR 96-8p. Therefore, the ALJ impermissibly truncated her analysis, and her failure to mention those impairments in her decision constitutes error. *See Lamell*, 2014 WL 282414, at *4; *Heatherstorm v. Berryhill*, 2017 WL 4641984, at *4-*5 (N.D. Cal. Oct. 17, 2017). And as discussed above, if the ALJ could not decipher Dr. Perdikis's notes, she had an independent duty to procure clearer notes to develop the record. *Garcia*, 2015 WL 7573653, at *8; *Burch*, 400 F.3d at 679; *Tonapetyan*, 242 F.3d at 1150.

Accordingly, the ALJ erred in her Step Two analysis and her evaluation of the impact of Plaintiff's impairments on her functional ability. As these errors could directly impact the RFC determination, the errors were not harmless and remand is warranted.

### III.   The ALJ's Evaluation of Plaintiff's Subjective Statements

#### A. Legal Standard

An ALJ must make two findings before discounting a claimant's statements regarding the severity and persistence of her symptoms. *See Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). "Second, if the claimant has produced that evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony regarding the severity of the claimant's symptoms" and those reasons must be supported by substantial evidence in the record. *Id.*; *Carmickle*, 533 F.3d at 1161 (providing that court must determine "whether the ALJ's adverse credibility finding . . . is supported by substantial evidence under the clear and convincing standard").

In March 2016, the Commissioner promulgated SSR 16-3p, which "makes clear what [Ninth Circuit] precedent already required:  that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms' . . . and not to delve into wide ranging scrutiny of the claimant's character and apparent truthfulness." *Trevizo*, 871 F.3d at 678 n.5.  Under SSR 16-3p, the ALJ shall determine whether to credit a claimant's statements about her pain and limitations by referring to the factors set forth in 20 C.F.R. § 404.1529(c)(3), which include:  the claimant's daily activities; the factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; the claimant's treatment, other than medication, for the symptoms; any other measure that the individual uses to relieve pain or other symptoms; and, finally, "any other factors concerning an individual's functional imitations and restrictions."  SSR 16-3p.  However, longstanding Ninth Circuit precedent

prohibits the Commissioner from rejecting subjective pain statements on the sole ground that they are not fully corroborated by objective medical evidence. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

### B. Plaintiff's Subjective Statements

In June 2015, Plaintiff completed a Function Report in connection with her benefits application. (AR 330-39.) She stated that she had congestive heart failure, causing her to be continuously out of breath with little or no walking; edema in her ankles due to unstable blood pressure; and uncontrollable type 2 diabetes causing blurred vision. (AR 330.) Plaintiff also experienced depression, suicide attempts, excessive crying, anxiety, and memory loss. (*Id.*) Plaintiff described her daily activities as checking her glucose levels and blood pressure, taking medication, eating, reading, and sleeping (at night and during the day). (AR 331.) Her anxiety affected her sleep. (*Id.*) When depressed, she had to be reminded to take medication. (AR 332.) She did not prepare her own meals because she did not have energy or appetite. (*Id.*) She loaded the dishwasher and did laundry with encouragement. (*Id.*) She went outside for doctors' appointments three times per month, but did not go out alone due to the side effects of her medication. (AR 333.) She shopped for clothing online and had no issue managing her personal finances. (AR 333-34.) She did not spend time with others, and went only to therapy on a regular basis. (AR 334-35.) Plaintiff felt nervous around others and had trouble getting along with family and friends because her depression impeded her ability to communicate; but she got along "ok" with authority figures. (AR 335-36.) Her conditions limited her ability to lift more than 5 pounds, walk more than one third of a mile, climb more than one flight of stairs, see, remember, complete tasks, and concentrate for more than 15 minutes. (AR 335.) She poorly handled stress and changes in routine, and she feared the outside world. (AR 336.)

At the February 2018 hearing, Plaintiff testified about her impairments. (AR 54-70.). She first discussed her physical impairments, stating her carpal tunnel syndrome impacted the

use of her arm and wrist, she had difficulty moving her knee requiring use of a cane, and her medication affected her coordination and alertness.  (AR 54, 57.)  She received 71 hours per month of in-home care services because she could not administer her own insulin.  (AR 54-55, 61.)  She suffered headaches due to elevated blood pressure.  (AR 55.)  Sitting for long periods caused a lot of pain in her neck and lower back.  (AR 56, 62.)  She could not sit for longer than 45 minutes to one hour at a time.  (AR 64-65.)  Concerning her cardiac issues, Plaintiff stated that she had mitral valve regurgitation, *i.e.*, blood backed up into her lung.  (AR 58.)  As a result, Plaintiff suffered shortness of breath and could not walk even short distances, *i.e.*, no more than one minute.  (*Id.*)  She experienced swelling in her ankles and feet, even while taking medication, and she needed to lift her feet above her heart while laying down.  (AR 59.)  She took five different blood pressure medications, which caused her to feel tired, fatigued, sleepy, dizzy, and dehydrated.  (AR 60-61.)

As to Plaintiff's psychiatric symptoms, she testified that she experienced side effects from her psychiatric medication; namely, she had experienced suicidal ideation.  (AR 65-66.)  Because of her depression, Plaintiff was "trying to look for some reason to live, let alone to have a job."  (AR 66.)  She had issues with her ability to focus and concentrate, and she experienced memory loss.  (*Id.*)  A home health aide assisted her with showering, bathing, and household chores such as cleaning, laundry, and cooking.  (AR 67.)  Plaintiff did not drive, in part because she experienced visual hallucinations.  (AR 67-70.)  She had a history of substance abuse, but no longer drank and went to therapy.  (AR 68-69.)

**C. The ALJ's Credibility Analysis**

The ALJ cited the two-step procedure, but did not explicitly apply it.  (*See* AR 21-22.)  Instead, she discussed some of Plaintiff's allegations from the 2015 function report and the 2018 hearing testimony, and then stated that "[d]espite these allegations, [Plaintiff] admitted she is capable of managing her personal care and hygiene without problem, perform typical

household chores such as laundry or washing dishes, shopping online, and managing her own personal finances." (AR 22.) The ALJ then found that the objective evidence did not support Plaintiff's allegations of disabling symptoms or of the existence of limitations greater than those reported in the RFC. (*Id.*)

### D. Analysis

Plaintiff argues that the ALJ erred by discounting Plaintiff's subjective statements on the basis of their purported inconsistency with the objective evidence because that evidence supports the existence of Plaintiff's underlying impairments. (Joint Stip. at 44.) She further contends that the ALJ failed to reach the second step of the credibility analysis. (*Id.* at 45, 51-52.) In response, the Commissioner argues that the ALJ provided valid reasons, supported by substantial evidence, for finding Plaintiff's subjective statements inconsistent with the record; specifically, the ALJ properly found that Plaintiff's statements were inconsistent with the objective evidence and that Plaintiff's symptoms improved with sobriety and treatment. (*Id.* at 46-49.) The Agency also refutes Plaintiff's contention that the ALJ failed to consider Plaintiff's daily activities. (*Id.* at 49-50.)

The ALJ's credibility analysis in this case is troubling. As an initial matter, while she cited the boilerplate language about the two-step procedure (AR 21), the ALJ does not appear to have used that procedure to analyze Plaintiff's statements. Nonetheless, the parties appear to focus on the second step of the two-step procedure, *i.e.*, the sufficiency of the reasons provided by the ALJ for her credibility determination. They do not contend that the ALJ erred at the first step or that Plaintiff failed to present evidence of an impairment that could produce her alleged symptoms. Accordingly, the Court declines to address whether the ALJ erred by failing to explicitly state whether Plaintiff presented evidence of an underlying impairment. Instead, the Court focuses on the parties' arguments and whether the ALJ erred at the second step of her credibility determination.

The ALJ discounted Plaintiff's subjective statements on two bases: the statements' purported inconsistency with objective medical evidence *and* the statements' inconsistency with Plaintiff's activities of daily living. (*See* AR 22.) If properly substantiated, these are specific and legitimate reasons for discrediting Plaintiff's statements. *See* 20 C.F.R. §§ 04.1529(c)(2), 416.929(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms."); *Rollins*, 261 F.3d at 857 ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."); *Smolen*, 80 F.3d at 1284 ("In weighing a plaintiff's credibility, the ALJ can consider may factors including . . . the plaintiff's daily activities."). However, for the reasons discussed below, the ALJ's reasons are not properly substantiated and so, her adverse credibility determination cannot stand.

Plaintiff produced evidence of her underlying physical and mental impairments and, therefore, the ALJ may not discredit her statements about as to the severity of her symptoms on the basis that they were not supported by objective medical evidence. *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *Reddick*, 157 F.3d at 722; *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989). Nonetheless, the evidence demonstrates that at least some instances of Plaintiff's subjective complaints were substantiated, and the ALJ may not ignore evidence supporting disability while relying on select normal findings in the record. *See Craig v. Astrue*, 269 F. App'x 710, 712 (9th Cir. 2008); *Robinson v. Barnhart*, 366 F,3d 1078, 1083 (10th Cir. 2004); *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Lacy v. Saul*, 2019 WL 4845965, at *10 (N.D. Cal. Oct. 1, 2019) (citing *Craig* and *Robinson*). For example, in July 2015, during a mental status evaluation, Plaintiff was "tearful" and reported symptoms of depression, and her doctor observed "objective signs of depression," including poor eye contact, slow speech, poverty of thoughts, and auditory hallucinations. (AR 734.) In February 2017, Plaintiff reported mood swings, hallucinations, and homicidal ideation, and her mental

status examination revealed poor eye contact, slow speech, poverty of thoughts, and auditory hallucinations. (AR 991.) These instances suggest that Plaintiff's subjective complaints were, at least sometimes, consistent with objective mental status findings. Although there were periods during treatment that Plaintiff's mental condition appeared stable, mental disabilities are "by their nature difficulty to diagnose," and there is inherent difficulty in "assessing the work capabilities of a Social Security applicant whose major problems are mental." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 603, 605 (9th Cir. 1999) (Noonan, J., dissenting); *see also Alvarado v. Astrue*, Case No. CV 07-5793-JTL, 2008 WL 2266309, at *5 (C.D. Cal. May 30, 2008) (citing *Morgan* for proposition hat "depression is a complex and highly idiosyncratic phenomenon that often waxes and wanes, eluding neat description").

The evidence also demonstrates that some instances of Plaintiff's subjective complaints relating to her physical impairments were in fact substantiated. For example, Plaintiff presented to Dr. Kumar with numerous complaints stemming from her cardiac condition, and Dr. Kumar's objective studies showed abnormalities in Plaintiff's cardiac function. (*See* AR 387 (January 2015 echocardiogram), 456 (March 2015 myocardial perfusion imaging), 971-72 (October 2015 echocardiogram).) Additionally, Plaintiff presented to Dr. Perdikis, complaining, *inter alia*, of lower back pain, and MRIs of her lumbar, cervical, and thoracic spine showed minimal, moderate, and moderate-to-severe abnormalities substantiated Plaintiff's spinal condition. (AR 1318, 1320-21, 1325-26, 1341-42, 1355, 1357-58, 1362-63.)

The ALJ also erred in rejecting Plaintiff's subjective complaints on the basis that her subjective complaints were inconsistent with her statements about her daily activities. The ALJ stated that despite Plaintiff's complaints, she "admitted she is capable of managing her own personal care and hygiene without problem, perform typical household chores such as laundry or washing dishes, shopping online, and managing her own personal finances." (AR 22.) "[T]he ALJ may reject a claimant's symptom testimony if the claimant is able to spend a substantial part of her day performing household chores or other activities that are

transferable to a work setting." *Smolen*, 80 F.3d at 1284 n.7. However, a claimant need not be "utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment[.]" *Id.* The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). "Only if [her] level of activity were inconsistent with her claimed limitations would these activities have any bearing on [her] credibility." *Reddick*, 157 F.3d at 722.

First, the record does not fully support the ALJ's observations about Plaintiff's activities of daily living. The ALJ stated that Plaintiff could engage in personal care and hygiene without problem and perform typical household chores. (AR 22.) However, Plaintiff testified that she required assistance with personal hygiene, grooming, and performing household chores. (AR 67-70.) She also stated in the 2015 function report that when she was particularly depressed, she needed reminders and encouragement to take her medication and perform chores, she had trouble sleeping, and she did not prepare her own meals. (AR 331-32.) Therefore, the ALJ appears to improperly mischaracterize Plaintiff's stated activities of daily living. *See Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir. 1999) (finding that ALJ's reason for discounting testimony was "inaccurate" where he mischaracterized Plaintiff's testimony underlying that reason).

Still, even if the ALJ had correctly characterized Plaintiff's activities, she does not explain how Plaintiff's ability to perform those activities translates into the ability to perform full-time work. *See Vertigan*, 260 F.3d at 1050. As the Ninth Circuit has noted, a claimant need not be "utterly incapacitated to be eligible for benefits, and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication. Yet if a claimant is able to spend a substantial part of [her] day engaged in pursuits involving the performance of physical

functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain." *Fair*, 885 F.2d at 604. In general, the Commissioner does not consider "activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs" to be substantial gainful activities. 20 C.F.R. § 404.1572(c).

Here, it is unclear how Plaintiff's stated abilities such as personal care and hygiene, performance of household chores, online shopping, and finance management, contradict Plaintiff's statements about symptoms relating to her major depressive disorder, a psychological impairment. Thus, based on the Court's review of the record as a whole, to the extent Plaintiff could perform some household activities, those do not appear to be inconsistent with her statements about her limitations. *See Reddick*, 157 F.3d at 715; *B.D.J. v. Saul*, Case No. CV 18-1498-SHK, 2019 WL 6317775, at *7 (C.D. Cal. Aug. 9, 2019). Plaintiff's ability to perform some activities, despite experiencing symptoms associated with her condition, "does not in any way detract from her credibility as to her overall disability." *Orn*, 495 F.3d at 639 (citing *Vertigan*, 260 F.3d at 1050). It is only when plaintiff can spend a "substantial part" of her day performing activities that are transferable to a work setting that "a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain." *Fair*, 885 F.2d at 603. Here, the ALJ made no such finding. Accordingly, the Court finds that inconsistency with Plaintiff's activities of daily living was not a legitimate reason supported by substantial record evidence to reject Plaintiff's subjective statements about the severity of her limitations.

The Agency contends that the ALJ discounted Plaintiff's subjective statements on a third basis: Plaintiff's improvement with sobriety and treatment. (Joint Stip. at 49 (citing AR 25).) However, the ALJ did not discount Plaintiff's subjective statements on that basis; rather, she discussed Plaintiff's alleged improvement with sobriety and treatment in the context of her

evaluation of the opinion evidence in this case, not during her credibility analysis. (*See* AR 24-25.) Accordingly, the Court finds no legal error in this aspect of the ALJ's analysis.

## IV. Remand For Further Administrative Proceedings Is Warranted

In light of the foregoing, the Court finds that ALJ erred in her: (1) evaluation of the opinion evidence in this case; (2) assessment of Plaintiff's cardiac, spinal, and pain symptoms at Step Two of the sequential analysis; and (3) in her adverse credibility determination. The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion. *Harman v. Apfel*, 211 F.3d 1172, 1175-78 (9th Cir. 2000). A district court may remand for an award of benefits when the following three conditions are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020. The third of these conditions "incorporates . . . a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made." *Id.* at 1020, n.26. However, even if those three requirements are met, the Court retains "flexibility" in determining the appropriate remedy and may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting *Garrison*, 759 F.3d at 1021).

In this case, the Court cannot say that further administrative proceedings would serve no useful purpose and, if the improperly discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled on remand. *See Garrison*, 759 F.3d at 1020. This case, then, is not the "rare exception" in which the credit as true rule should be applied and the

matter remanded for the calculation and award of benefits. *See Leon v. Berryhill*, 874 F.3d 1130, 1133 (9th Cir. 2017). Therefore, the Court remands for further administrative proceedings consistent with this Order. Upon remand, the ALJ is not precluded from reassessing any evidence.

## CONCLUSION

Accordingly, for the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED AND REMANDED for further administrative proceedings consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and counsel for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATE: April 6, 2020

KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE